1
2
3
4
5
6
7 **UNITED STATES DISTRICT COURT**
8 **EASTERN DISTRICT OF CALIFORNIA**
9

10 | **TRUE ORGANIC PRODUCTS, INC.,** | **CASE NO. 1:18-CV-1278 AWI EG**
11 | **Plaintiff** |
12 | **v.** | **ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
13 | **CALIFORNIA ORGANIC FERTILIZERS, INC.,** |
14 | | (Doc. No. 11)
15 | **Defendant** |

16

17    This is a false advertising case brought by Plaintiff True Organic Products, Inc. ("True")

18 against Defendant California Organic Fertilizers, Inc. ("COFI"). True alleges claims under 15

19 U.S.C. § 1125 (the Lanham Act) and California Business & Professions Code §§ 17200 and

20 17500. Currently pending before the Court is True's motion for a preliminary injunction.

21 Because the Court concludes that True has not adequately established that it will suffer an

22 irreparable injury if a preliminary injunction does not issue, True's motion will be denied.

23

24                    **PRELIMINARY INJUNCTION FRAMEWORK**

25    To obtain a preliminary injunction, a plaintiff must establish: "(1) that he is likely to

26 succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary

27 relief, (3) that the balance of the equities tips in his favor, and (4) that an injunction is in the public

28 interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); A Woman's Friend

Pregnancy Res. Clinic v. Becerra, 901 F.3d 1166, 1167 (9th Cir. 2018); Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018).  A plaintiff must make a showing on all four elements/prongs to obtain a preliminary injunction.  A Woman's Friend, 901 F.3d at 1167; Feldman v. Reagan, 843 F.3d 366, 375 (9th Cir. 2016).  In the Ninth Circuit, there is "a sliding scale, such that where there are only 'serious questions going to the merits'—that is, less than a 'likelihood of success' on the merits— a preliminary injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied."  Short,893 F.3d at 375; Feldman, 83 F.3d at 375; see also A Woman's Friend, 901 F.3d at 1167.  "Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."  Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); see also Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22; Feldman, 843 F.3d at 375.

## GENERAL BACKGROUND

From the Complaint and the submissions of the parties, True is in the business of manufacturing and selling organic fertilizers.  Most of True's sales are in California, Washington, Oregon, and Arizona.  Since its inception in 2003, True has grown to be one of the largest and most sought-after manufacturers of organic fertilizers on the West Coast.

COFI is a small business that also manufactures and sells organic fertilizer.  COFI is a direct competitor of True regarding various fertilizers.  As relevant to this lawsuit, COFI and True directly compete for sales of organic liquid fertilizer containing at least 4% nitrogen.

COFI sells a liquid fertilizer that is known as Phytamin Clear.  Phytamin Clear's label states that it contains 4% nitrogen, which is composed of 3% nitrate nitrogen and 1% ammoniacal nitrogen.  Phytamin Clear's label also reads:  "Derived from mined seabird guano."  The Material Safety Data Sheet for Phytamin Clear identifies the "chemical name" of the product as "Fossilized Seabird Guano Extract Solution," and lists the "Composition/Ingredients" as "Fossilized Seabird

Guano." Phytamin Clear, as the name suggests, is a clear liquid. Phytamin Clear is appealing to growers because of its high nitrate nitrogen levels and because the clear liquid can be easily applied through irrigation systems.

True sells three products that most directly compete with Phytamin Clear: True 412, True 413, and True 512. True 512 contains 5% nitrogen, while True 412 and True 413 contain 4% nitrogen, but they do not contain nitrate nitrogen.[1] These products also do not contain sodium nitrate. These fertilizers are made from liquified fish, beet extract, de-sugared molasses, and corn steep liquor.

The market for liquid organic fertilizers containing at least 4% nitrogen is limited. On the West Coast, a total of six companies make competing products (including True and COFI). True "controls over 50% of the market" for organic liquid fertilizers containing at least 4% nitrogen.

True became aware of Phytamin Clear in 2012 and was skeptical that Phytamin Clear was made exclusively from seabird guano, as indicated on the label. Based on True's experience with seabird guano products, the nitrate nitrogen content of Phytamin Clear did not appear to be consistent with seabird guano based products.

In 2013, True informally raised concerns about Phytamin Clear to the California Department of Food and Agriculture. However, no changes have been made to the Phytamin Clear label. True concluded that the only way to confirm whether Phytamin Clear is actually derived from mined seabird guano was to invest and test samples of Phytamin Clear.

Import data shows that since at least 2010, COFI has been importing seabird guano products from multiple companies in Chile. Import data also shows that COFI has been importing "nitrogenated" red guano products from Chile since 2011. In 2018, COFI imported a "significant" amount of a product referred to as "Nitrogenated Red Guano Fossilized Sea Bird Organic Fertilizer." A company from whom COFI purchases these products (Guano Rojo Gruesa) advertises three products: Red Guano (0.5 to 1.5% nitrogen), Guano Rojo Premium (4 to 8%

---

[1] Nitrate nitrogen is a form of nitrogen that is taken up quickly by plants. See Menes Dec. ¶ 5. Most organic fertilizers contain organic nitrogen, which must first be broken down by the soil's microbiological processes before it becomes available to nourish plants. See id. Because organic nitrogen must be broken down before becoming available to plants, a plant's response to organic nitrogen is not as quick as its response to nitrate nitrogen. See id.

nitrogen), and Guano Rojo Nitrogenado (4 to 8% nitrogen).[2]  True contends that the product that is used to nitrogenate the red seabird guano and Phytamin Clear is sodium nitrate, a substance approved for use in organic farming in the United States, but not in Canada.

From October 2017 to April 2018, True obtained five samples of what it alleges is Phytamin Clear that came from at least four different batches.  The five samples were contained in five totes and obtained from two farms in California.[3]  During this same time frame, True obtained other products and materials to comparison test with Phytamin Clear, including Sigma Aldrich Saltpeter (the accepted reference sample for Chilean sodium nitrate), Man Agricola Norterra Red Guana (a fossilized seabird guano), Peruvian seabird guano, and several products sold by SQM North America Corp. that were derived from Chilean sodium nitrate and potassium sulfate.  Dellavalle Laboratory took samples of each of the products and materials and sent them to various laboratories for sampling and analysis to determine the various chemicals in the products.

The results of the sampling were reviewed by Dr. William Horwath, a Professor of Soil Biogeochemistry from the University of California at Davis.  In short, Dr. Horwath concluded that Phytamin Clear is not solely derived from mined seabird guano or a fossilized seabird guano extract.  Dr. Horwath concluded that the amounts of perchlorate, nitrate nitrogen, phosphorous, sodium, potassium, phosphoric acid, and potash in Phytamin Clear, as well as Phytamin Clear's low viscosity, were inconsistent with a product derived solely from mined or fossilized seabird guano, but were consistent with a product made from Chilean sodium nitrate.

Based on Dr. Horwath's conclusions, True contends that COFI's labels are literally false, and that Phytamin Clear is not made solely from fossilized seabird guano.

---

[2] In its opposition, COFI contends that "nitrogenado" does not mean "nitrogenated," i.e. does not mean that nitrogen has been added to or combined with something.  Rather, COFI contends that "nitrogenado" means "nitrogenous," i.e. means that something contains nitrogen.  See Doc. No. 17 at 3 n.1 (citing only versions of the Oxford Spanish dictionary and the Merriam Webster English dictionary).

[3] COFI has made substantial arguments regarding the authenticity and/or purity of the samples of Phytamin Clear obtained by True.  COFI's president indicates that COFI rarely sells Phytamin Clear in totes, that the samples obtained by True correspond to lots that were not sold in totes, that the lot numbers on the totes do not indicate a direct sale to the two farms involved, that the labeling on the totes obtained does not match the labeling for totes that COFI uses, and one of the distributors involved with the totes has not purchased Phytamin Clear from COFI since 2015.  See T. Stemwedel Dec. ¶¶ 7-20.  Based on the Court's resolution of the motion for preliminary injunction, it is unnecessary to make any rulings regarding the samples Phytamin Clear obtained by True.  It is enough to note COFI's arguments regarding the "reliability" of True's samples of Phytamin Clear.

**PLAINTIFF'S MOTION**

*Plaintiff's Arguments*

True argues *inter alia* that it will suffer two forms of irreparable harm if a preliminary

injunction does not issue.  First, True and COFI are direct competitors for liquid organic fertilizers

containing 4% nitrogen.  Sales of Phytamin Clear represent lost sales of True's clear liquid

organic fertilizers (either True 412, 413, or 513).  Diversion of sales to COFI represents a serious

injury to True, and to growers seeking organic liquid fertilizers by misleading them into believing

that Phytamin Clear contains 4% nitrate nitrogen mined from seabird guano, when in fact

Phytamin Clear is made from sodium nitrate.  Organic growers who purchase Phytamin Clear are

paying a premium for sodium nitrate that can be purchased much less expensively.

Second, Phytamin Clear's label lessens the goodwill of True by implying that the nutrient

content of Phytamin Clear can be achieved through the use of seabird guano.  Similar liquid

products offered by True are not made of seabird guano because it is not possible to do so.  Thus,

in comparison between True's products and Phytamin Clear, True suffers and its goodwill in the

relevant marketplace is lessened.  Further, the general goodwill associated with organic fertilizer

products is lessened by misleading advertising that cause farmers to distrust organic fertilizers.

*Defendant's Opposition*

COFI argues *inter alia* that there is no evidence that an irreparable injury will result in the

absence of an injunction.  The only harm at issue is monetary in nature, which is insufficient.  Lost

sales are damages that can be compensated through monetary relief.  Further, while True argues

that the alleged misrepresentations on the Phytamin Clear label harms True's goodwill, True only

discusses its inability to create a similar product from seabird guano.  True does not actually

explain how Phytamin Clear's label could harm True's goodwill or cause confusion about which

company actually made Phytamin Clear.   However, even if there was some loss of goodwill

present, True does not explain why that loss could not be valued in this case.

*Relevant Declaration Excerpts*

In relevant part, True's president and founder, Jake Evans, declares:

By selling Phytamin Clear with a label that makes false claims about the

composition of the product, COFI is misleading its customers, many of whom are also TRUE's customers, about the most important aspects of Phytamin Clear. COFI is causing harm to True by taking away sales to customers who are looking for an organic liquid fertilizer with at least 4% nitrogen made from established organic inputs, as opposed to a sodium nitrate based product.

. . . While federal law allows the use of sodium nitrate as an organic fertilizer in the United States . . ., Canada, a major importer of California organic products, has banned the use of sodium nitrate on organic products sold in that country. Many of the larger organic growers in California export products to Canada and cannot legally use sodium nitrate fertilizer.

. . . .

Other than True's products and Phytamin Clear, there are relatively few organic liquid fertilizer products on the market containing at least 4% nitrogen. The only other companies that sell organic liquid fertilizer containing at least 4% nitrogen on the West Coast are BWF Banducci, Inc., Dune Co., and Mar y Tierra. A company called Converted Organics sells a liquid fertilizer with 4% nitrogen, but its label states that it contains sodium nitrate.

For the reasons set forth above, many organic growers choose not to use sodium nitrate based liquid fertilizers on their organic crops even though sodium nitrate contains the desirable nitrate nitrogen that provides quick plant response. True's liquid fertilizer products containing at least 4% nitrogen do not contain nitrate nitrogen because it is not contained in standard in organic inputs. COFI unfairly competes with True by selling Phytamin Clear to growers under a false label that misleads consumers (organic growers) into believing that Phytamin Clear contains 4% nitrogen, mostly nitrate nitrogen, from mined seabird guano, when in fact it appears that Phytamin Clear is made from sodium nitrate. In addition, organic growers who purchase Phytamin Clear are disadvantaged because they are paying a premium price for sodium nitrate that can be purchased much less expensively from other companies.

Despite the false and misleading label on Phytamin Clear, True has been successful in the market for organic fertilizer containing at least 4% nitrogen. True's share of that market exceeds 50% of total sales. Nevertheless, COFI sells a considerable amount of Phytamin Clear in that market and is damaging True by unfairly taking away sales from True. Because True controls over 50% of the market for organic liquid fertilizers containing 4% nitrogen, sales of Phytamin Clear inevitably result in lost sales for True's organic liquid fertilizer products containing at least 4% nitrogen.

Evans Dec. ¶¶ 5-10.

### *Discussion*

"Irreparable harm" is "traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." Arizona Dream Act Coalition v. Brewer, 855 F.3d 957, 978 (9th Cir. 2017). "Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation." Goldie's Bookstore, Inc. v. Superior Ct., 739 F.2d 466, 471 (9th Cir. 1984); see also California v. Azar, 911 F.3d 558, 581

(9th Cir. 2018) ("Economic harm is not normally considered irreparable."); American Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473-74 (9th Cir. 1985) ("Monetary damages are not usually sufficient to establish irreparable harm."). "[S]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. . . . a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." Boardman v. Pacific Seafood Grp., 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting Caribbean Marine Servs. Co., Inc. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988)). Evidence and arguments that are "cursory," "conclusory," or amount to mere platitudes, are insufficient to demonstrate irreparable harm. Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc., 736 F.3d 139, 1250 (9th Cir. 2013). "There must be a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined . . . ." National Wildlife Fed'n v. National Marine Fisheries Serv., 886 F.3d 803, 819 (9th Cir. 2018). A plaintiff must show that the irreparable harm "is likely in the absence of an injunction." Winter, 555 U.S. at 22; National Wildlife, 886 F.3d at 819.

Here, True essentially contends that it will face irreparable harm in two ways: loss of goodwill and lost sales/potential customers. The Court will examine these harms separately.

1.    Goodwill

Courts have recognized that, because of the difficulty of valuing goodwill, a loss of or damage to goodwill can constitute an irreparable harm for purposes of a preliminary injunction. See Husky Ventures, Inc. v. B55 Invs., Ltd., 911 F.3d 1000, 1012 (10th Cir. 2018); Adidas Am., Inc. v. Skechers USA, Inc., 890 F.3d 747, 756 (9th Cir. 2018); Herb Reed, 736 F.3d at 1250. However, a plaintiff must present "concrete evidence" of harm to goodwill in order to show a likelihood of irreparable harm. Adidas, 890 F.3d at 756.

Here, there is no evidence that True's goodwill is likely to be harmed in the absence of a preliminary injunction against the Phytamin Clear label. COFI and True are separate and unrelated companies. The labels attached to True's Complaint show that COFI is identified as the manufacturer of Phytamin Clear. See Complaint at pp. 6-7. The Phytamin Clear label does not reference True or any of True's products in any way whatsoever. Further, True has cited no authority that supports its argument that the allegedly false representations by COFI in a label

7

relating *only* to COFI's product could reasonably damage the goodwill of True or all businesses in the market for liquid organic fertilizer containing at least 4% nitrogen. Such a position is counterintuitive and contrary to the concept of "goodwill." "Goodwill" generally relates to the positive reputation, public confidence in, and customer loyalty to, an individual business entity. E.g. E.T. Prods., LLC v. D.E. Miller Holdings, Inc., 872 F.3d 464, 467 (7th Cir. 2017) ("One of the assets typically transferred in a business sale is goodwill, an intangible asset that includes the value of the company's reputation and customer relationships."); White Tower System, Inc. v. White Castel System, Inc., 90 F.2d 60, 69 (6th Cir. 1937) ("Good will may be defined as the favorable consideration shown by the purchasing public to goods known to emanate from a particular source."); Squires v. United States, 289 F.Supp. 597, 600 (C.D. Cal. 1968) ("Any definition of goodwill includes the concept of the advantage that the proprietor of an existing business enjoys resulting from the probabilities that old customers will continue their patronage."); Black's Law Dictionary 810 (10th ed. 2014) (defining "goodwill" in part as: "A business's reputation, patronage, and other intangible assets that are considered when appraising the business, especially for purchase . . . ."); Black's Law Dictionary 694 (6t h ed. 1990) (defining "goodwill" in part as: "[E]very positive advantage that has been acquired by a proprietor in carrying on his business, whether connected with the premises in which the business is conducted, or with the name under which it is managed, or with any other matter carrying with it the benefit of the business."). Phytamin Clear is COFI's product, it has nothing to do with True. As such, any negative ramifications to goodwill due to a false label would fall on COFI alone. Consistent with the individualized nature of goodwill, True has presented no evidence that the Phytamin Clear label has in fact adversely affected True's goodwill. There is only speculation and unsupported argument that True's goodwill (and the goodwill of other manufacturers of organic fertilizers) is harmed by the derivation information on Phytamin Clear's label. See Boardman, 822 F.3d at 1022; Herb Reed Enters., 736 F.3d at 1250. No "concrete" evidence of damaged goodwill to True has been submitted.[4] See Adidas, 890 F.3d at 756.

---

[4] To the contrary, True is one of the largest manufacturers of organic fertilizers, True's products are highly sought-after, and True controls over 50% of the market for liquid fertilizers containing at least 4% nitrogen. See Evans Dec. ¶¶ 2, 10. Phytamin Clear has been on the market since 2010. See Complaint ¶ 20. Given the success of True despite

1    In sum, True has failed to meet its burden of showing that it is likely that its goodwill will

2 suffer if a preliminary injunction does not issue.  See Adidas, 890 F.3d at 756; Boardman, 822

3 F.3d at 1022; Herb Reed Enters., 736 F.3d at 1250.

4        2.        Lost Sales/Prospective Customers

5        The Ninth Circuit has held that "[e]vidence of threatened loss of prospective customers or

6 goodwill certainly supports a finding of the possibility of irreparable harm."  Stuhlbarg Int'l Sales

7 Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001).  Relying on Stuhlbarg and the

8 declaration of its President Jake Evans, True argues that it will lose sales and potential customers

9 to COFI because organic growers will be misled by Phytamin Clear's label.  The Court cannot

10 agree.

11       First, there is no evidence that demonstrates True has actually lost any customers or sales

12 to COFI based on the allegedly false representations on the Phytamin Clear label.  True has

13 submitted no figures or examples that show the loss of any sales or the loss of any customers,

14 prospective or otherwise, for any reason let alone reasons relating to Phytamin Clear's label.

15 Instead, the Evans declaration states in general that True will lose sales because COFI is a direct

16 competitor of True in the market for a specific type of organic fertilizer.  Such an argument is

17 tantamount to presuming harm since the mere allegation of "direct competition" takes the place of

18 actual evidence, and a presumption of harm is improper.  See Adidas, 890 F.3d at 762; Herb Reed,

19 890 F.3d at 762.  True's argument also overlooks the fact that there are four other companies that

20 make liquid organic fertilizers that appear to directly compete with both True and COFI.  There is

21 no reason to assume that an organic grower would stop buying COFI's products and automatically

22 turn to True's products if Phytamin Clear's label was changed or enjoined.  True has failed to offer

23 any non-cursory evidence and arguments that it is likely to suffer the irreparable harms alleged.

24 See Herb Reed, 890 F.3d at 762.

25       Second, "lost profits due to lost sales generally constitutes the type of harm that is fully

26 compensable through money damages and therefore does not support injunctive relief."  Amylin

27

28 Phytamin Clear's presence in the market for nine years, it appears that True's goodwill is in no danger from Phytamin
Clear's label.

Pharm., Inc. v. Eli Lilly & Co., 456 F. App'x 676, 678 (9th Cir. 2011); see also Metalcraft of

Mayville, Inc. v. Toro Co., 848 F.3d 1358, 1368 (Fed. Cir. 2017) ("Evidence of potential lost sales

alone does not demonstrate irreparable harm."); American Passage, 750 F.2d at 1473 (noting lost

revenues, which did not jeopardize the plaintiff's very existence, were money damages and not

irreparable harm); CZ Servs. v. Express Scripts Holding Co., 2018 U.S. Dist. LEXIS 176992, *9

(N.D. Cal. Oct. 15, 2018) (in context of temporary restraining order, holding that statements about

customer loss was effectively a claim for lost revenue and profit, which is redressable through

monetary damages); Nutrition Distribution, LLC v. Enhanced Athlete, Inc., 2017 U.S. Dist.

LEXIS 188380, *6 (E.D. Cal. Nov. 13, 2017) (holding that lost sales constituted money damages

and not an irreparable injury); Ojmar US, LLC v. Sec. People, Inc., 2017 U.S. Dist. LEXIS

105444, at *4-*5 (N.D. Cal. July 7, 2017) (holding that evidence of lost profits were insufficient to

show irreparable harm). True fails to explain why any lost sales it may suffer due to Phytamin

Clear's label cannot be redressed through an award of money damages or otherwise explain why

any lost sales would be irreparable. Therefore, there is no basis for the Court to conclude that an

unquantified amount of lost sales/lost profits constitutes irreparable harm.

 The Court finds that the three cases cited by True are distinguishable. First, *Stuhlbarg Int'l

Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832 (9th Cir. 2001) was a trademark dispute

over use of the term "fire-safe" in connection with fire-resistant safes/storage boxes. Brush had

played a role in the detention of a shipment of 6,400 safes that were part of an initial order from a

new customer to Stuhlbarg (but an old customer to Brush), K-mart. See id. at 835. In upholding a

preliminary injunction against Brush, the Ninth Circuit noted that Stuhlbarg "stood to lose its

newfound customers and accompanying good will and revenue," and that the threatened loss of

prospective customers or goodwill supported a finding of irreparable harm. Id. at 841. In this

case, however, there is no indication that True's goodwill is harmed or endangered in any way by

the Phytamin Clear label. Further, there is no evidence that Phytamin Clear's label will be

jeopardizing new large clients and harming True's reputation with those new clients. COFI and

the Phytamin Clear label do not hinder True's ability to market, manufacture, distribute, and

supply its products to new, existing, or potential customers.

Second, *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469 (9th Cir. 2015) involved a dispute between two competing businesses that sold medical alert devices and monitoring services. Lifewatch made robocalls using phrases that had been trademarked by Life Alert. See id. at 437-74. Life Alert submitted evidence of "numerous and persistent complaints from would-be customers who received robocalls for what they believed were Life Alert products. Life Alert also submitted emails and social media posts from consumers." Id. at 474. Citing *Stuhlbarg*, the Ninth Circuit confirmed that Life Alert's evidence substantiated a threat to Life Alert's reputation and goodwill. See id. In this case, however, True has submitted no evidence that consumers are confusing Phytamin Clear for a True product, or that COFI has otherwise engaged in conduct with respect to Phytamin Clear that causes consumers to be angry with True. The evidence submitted indicates that Phytamin Clear is clearly associated with COFI, not True.

Finally, *Seed Servs., Inc. v. Winsor Grain, Inc.*, 868 F. Supp. 2d 998 (E.D. Cal. 2012) was a trademark infringement case. By contract, the defendant agreed not to sell seeds under the plaintiff's trademarked name "California Gold" in the Middle East. See id. at 1001. However, the defendant attempted to sell seeds grown in Australia under the "California Gold" trademark to one of the plaintiff's clients in Saudi Arabia. See id. This Court found irreparable harm to support a preliminary injunction. See id. at 1005. This Court recognized *Stuhlbarg* and then cited cases that found irreparable harm in the context of trademarks due to a loss of control of a mark, which results in a loss of business reputation. See id. at 1005. That is, this Court recognized irreparable harm because the likely loss of the trademark "California Gold" would adversely affect Seed Services's goodwill/business reputation. See id. In this case, however, COFI is not selling any product that bears any of True's trademarks or product names. There is no evidence that COFI is doing anything with Phytamin Clear or the Phytamin Clear label that could cause True to lose control of any mark or product owned by True.

In sum, because True has not made a clear showing that it is likely to suffer irreparable harm in the absence of a preliminary injunction, True's motion will be denied. See Winter, 555 U.S. at 20-22; Adidas, 890 F.3d at 756; Boardman, 822 F.3d at 1022; Herb Reed, 736 F.3d at 1250; Amylin Pharm., 456 F. App'x at 678; American Passage, 750 F.2d at 1473.

**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for a preliminary injunction (Doc. No. 11) is DENIED; and

2.  This matter is referred to the Magistrate Judge for the purpose of entering a scheduling order.

IT IS SO ORDERED.

Dated:   March 4, 2019   

_____

SENIOR   DISTRICT   JUDGE